# CHARLESTON.

PASQUALE PETRELLI *et al.* v. WEST VIRGINIA-PITTSBURGH COAL
COMPANY.

Submitted September 7, 1920.   Decided September 14, 1920.

1. MINES AND MINERALS—*Wrongfulness of Mining Operations Depends on Intent in Doing Acts.*

In an action for the unlawful removal of coal by wrongfully extended mining operations into adjoining property, the measure of damages depends upon whether the wrongful act was done wilfully and with knowledge of the violation of the property rights of another, or innocently, through the mistaken belief of the trespasser as to his own rights, due to excusable ignorance of the facts upon which such rights depend. (p. 608).

2. SAME—*One Extending Mining Operations Into Another's Land is a "Willful Trespasser."*

One who, with knowledge that he is invading the rights of another, extends, or permits the extension of, a mine which he is operating upon his own property into land owned by another, and operates or permits its operation there, is a wilful trespasser within the meaning of the law. (p. 608).

3. SAME—*For Willful Subteranean Trespass on Mineral Lands, Measure of Damages is Value of Thing Mined.*

The measure of damages for a wilful subterranean trespass upon mineral lands is the value of the thing mined, after its severance, without deduction of expenses incurred in mining and removing it. (p. 608).

4. LIMITATION OF ACTION—*Action for Subterranean Trespass Accrues on Discovery of Wrongful Act.*

Where a cause of action accrues for the unlawful removal of coal by wrongfully extending mining operations into adjoining property, the statute of limitations begins to run only from the time of actual discovery of the trespass, or the time when discovery was reasonably possible. (p. 614).

(WILLIAMS, PRESIDENT, absent.)

Error to Circuit Court, Brooke County.

Action by Pasquale Petrelli and others against the West Vir-

ginia-Pittsburgh Coal Company.　　Judgment for plaintiffs, and defendant brings error.

*Affirmed.*

*James F. Cree,* and *J. Bernard Handlan,* for plaintiff in error.

*Ramsey & Wilkin, Ralph B. Cohen,* and *Dio Rogers,* for defendants in error.

Lynch, Judge:

Of the two causes of action, according to the averments of the declaration, one is defendant's mining and removal of a material part of the Pittsburgh seam of coal underlying lands jointly owned by plaintiffs, without their knowledge or consent, the other the consequential impairment or destruction of a natural surface issue of water from the land resulting from such operation. Defendant by demurrer challenges the sufficiency of the declaration, but as it seems to be in the form usual in cases of this sort and without any substantial imperfections, and none are pointed out, there is no necessity for analyzing it.

Though named as the second cause of action, we choose rather first to consider and determine the right of plaintiffs to recover for the injury, if any, done the spring, considered in the light of the proof introduced to show the quantum of damage done to it by the unlawful removal of the coal. The spring was a natural flow of sweet water from a hillside on plaintiffs' property, several feet above the top of the vein of coal underlying the tract, and 490 feet from the division line between their land and that owned and operated by defendant. Its existence was testified to clearly and unequivocally by Pasquale Petrelli and John N. Leech, both of whom were well acquainted with it, knew its location and had drunk of its waters. An attempt was made by witnesses for defendant to question the existence of such a spring, at that point, but testimony in support of their contention was weak and inconclusive. The fact of its destruction was not known until late in the year 1916, when Pasquale Petrelli and Leech, the latter employed as an engineer to make a survey for a tramway which plaintiffs contemplated building for use by them in connection with proposed mining operations

on their own land, discovered that its flow had ceased. It was this discovery, together with the presence of several places where the surface had subsided, that led to investigation, and ultimately to the driving of test entries on plaintiffs' land, from which they ascertained that defendant's operations had crossed the division line and entered their property. Defendant denies that its operations extended so far over the line as to interfere with a spring 490 feet distant from the boundary. But, as will more fully appear in the discussion of the main cause of action asserted by plaintiffs, namely, the removal of their coal, defendant's witnesses admit and its maps show that twelve or fourteen rooms and entries have crossed the line for distances ranging from 10 to 90 feet. Moreover, plaintiffs have discovered, as a result of their test entries, rooms even farther removed from the division line and not shown on defendant's maps at all; and Bywater, a witness for plaintiffs, formerly an employee of defendant, states that while engaged, sometime during the year 1917, in removing tracks from an entry which the company's maps showed to be on the land of plaintiffs, he could see that the entry extended at least 150 feet farther into their property to a "cave-in" which obstructed his view and prevened him from ascertaining whether it extended beyond that point. Defendant's removal of the ribs and pillars supporting the roofs of the encroaching entries and rooms, thereby causing them gradually to settle and fill the operations with debris, rendered it exceedingly difficult and unsafe, if not wholly dangerous, to go into them for any purpose and especially for the purpose of measuring the excavations to enable them to estimate the extent of the encroachment. The witness Bywater also testifies that the floor of the old entry where he was engaged at work was covered with water to the depth of about one foot, while the roof at that point was dry, strongly indicating that the water had come from some other source than immediately overhead. From evidence such as this, especially in view of the obvious difficulty and danger of entering and tracing the extent of the old entries—a difficulty and danger caused by defendant's acts in entering upon, mining coal from, and drawing pillars in, lands known to belong to others, the jury could properly find that the trespassing operations had extended beyond the points

disclosed by defendant's maps and in some manner had interfered with the course of the subterranean stream feeding the spring on plaintiffs' land, and that the resulting subsidence of superincumbent stratas had opened a new course of less resistance for the water to take.

There was little attempt upon the part of plaintiffs to establish the value of the spring so destroyed; in fact, there is only one reference to its value and that consists of an indefinite statement by Pasquale Petrelli: "I have a spring that I wouldn't take any kinds of money for. I wouldn't take $3,500 for the spring." In view of the fact, which will appear more fully later, that the evidence offered upon the issue presented by the first count is amply sufficient to sustain the jury's verdict without regard to the spring, it is unnecessary for us to consider whether this statement standing alone would be sufficient to support a verdict for damages upon the count relating to the cessation of the water flow, and probably the jury did disregard it because of the insufficiency of the proof touching the injury done to it, if any. They may have thought it too far removed from the property line to be affected by the trespass.

The more important claim for damages is for the removal of coal underlying that part of plaintiffs' property which adjoins defendant's. As noted already, the fact that the mining operations of the latter had encroached upon their land did not become known to plaintiffs until late in the year 1916, when Pasquale Petrelli and the engineer Leech discovered that the spring which theretofore had existed had ceased to flow. Thereupon plaintiff and the engineer immediately sought admission to the mine at the entrance on defendant's property, but were told that it would be impossible for them to get back as far as the division line or beyond it, because of the drawing of the ribs and pillars supporting the ceilings of the entries and rooms. Because of these barriers, the existence of which were thus confessed, plaintiffs early in 1917 began to drive test entries, under the direction of the engineer Leech, on their own side of the line, and struck abandoned rooms filled with the debris of collapsing roofs, thereby making dangerous an attempt to enter the excavations, especially because of the accumulation of black damp and other explosive gases. Defendant's witnesses themselves

were forced to admit the existence, first of six, then of twelve or fourteen rooms or entries that encroached upon plaintiffs' land, as shown by the company's own maps, for distances ranging from 10 to 90 feet; and Bywater's testimony, referred to above, discloses the existence of an entry in 1917 extending into plaintiffs' property for a distance of at least 150 feet, the view beyond that point being obstructed by a large "cave-in" completely blocking further progress, he says. In addition, the entries which plaintiffs drove into the old workings, as recorded on a map prepared by Leech, disclosed rooms worked and abandoned beyond those represented on the company's maps, and which D. E. Taylor, defendant's engineer, admitted were not in existence when he made his survey and prepared his map in January, 1913, showing the encroachments as they existed as of that date.

The difficulty of gaining access to old mine workings whose pillars are drawn and ceilings down is obvious. Despite these obstacles plaintiffs diligently drove their test entries during the period of more than one year between the discovery of the trespass and the date of the trial, at a total expense of several thousand dollars, and thereby discovered many abandoned rooms and entries. From the admissions of witnesses for defendant that at least two encroachments extended to a depth of 90 feet, the testimony of Bywater, and observations made by plaintiffs and Leech in the test entries disclosing a probable further encroachment of indefinite depth, considered in connection with the cessation of flow of the spring 490 feet from the division line, Leech estimates that defendant has removed the coal under 11 acres of plaintiffs' land, or an aggregate of 55,000 tons, allowing 5,000 tons to the acre, which is a conservative estimate.

On the other hand, it was the estimate of defendant's witnesses, based upon the encroachments as disclosed by the company's maps, that they had removed as much as, but not more than, 1,044 tons of plaintiffs' coal. When pressed, however, concerning the difficulty and danger of mining any coal which might have been left in that section of plaintiffs' land, due to the drawing of the pillars and the resulting subsidence of slate and other earthy substances, H. J. Watson, defendant's chief engineer, estimated that a line drawn parallel to the boundary

line separating the two properties, through a point on plaintiffs' land 72 feet from the line, would represent the average encroachment upon it and would enclose about one acre and a half—a fair estimate, according to his deduction based upon the company's maps, of the maximum amount of plaintiffs' coal taken or damaged by the company—and that it would be entirely safe to mine the rest of plaintiffs' coal at least to that line. This estimate, however, is based upon a maximum encroachment of 90 feet disclosed by defendant's maps, and if the true maximum encroachment should extend further, as the evidence hereinbefore referred to strongly tends to indicate, the acreage of coal removed or rendered unsafe for mining would be greater than an acre and a half.

In determining whether the verdict of the jury awarding plaintiffs $15,000 was excessive, it is necessary first to consider the character of the trespass committed by defendant, for the measure of damages depends upon whether the wrongful act was done wilfully and with knowledge of the violation of another's rights, or innocently, through bona fide but mistaken belief as to defendant's rights, due to excusable ignorance of the facts upon which such rights depend. *Pittsburgh & W. Va. Gas Co.* v. *Pentress Gas Co.,* 84 W. Va. 449, 100 S. E. 296; 18 R. C. L. p. 1256; 27 Cyc. 639, 640; note, Ann. Cas. 1913A, 562; 1 Barringer & Adams, Mines & Mining, p. 689 et seq; 2 idem p. 644 et seq.

It is admitted by the officers and agents of the defendant corporation that they had knowledge of the encroachment upon plaintiffs' property. That knowledge dated at least from the time of the survey and preparation of maps in January, 1913, testified to by witness Taylor, and probably existed before that. Taylor swears that his map shows all entries and rooms existing at that date. If that be true, the additional rooms disclosed by the entries driven by plaintiffs, and the entry testified to by witness Bywater as extending at least 150 feet over the division line, must have been made after January, 1913, and therefore with the full and complete knowledge of the company. In this day of accurate civil engineering and skilled mine organization and management there is but little, if any, excuse for trespass

beyond the boundaries within which mining lawfully may be done. *Gawthorp* v. *Fairmont Coal Co.*, 74 W. Va. 39. Reasonable endeavor to ascertain the facts in the first instance would have disclosed the approach of the operations to the five-foot limit prescribed by statute, and it is almost inconceivable that they could have been driven across the boundary line onto plaintiff's property without full knowledge on the part of the officers and agents of defendant. Indeed, there is ample testimony justifying a finding by the jury that defendant wilfully and with full knowledge permitted its employees to cross into and mine coal from property that did not belong to them. Upon discovery of the fact of the trespass in 1913, even assuming it was not known before, a proper course indicative of due regard for the rights of others would have been to notify plaintiffs and pay for the coal removed while accurate measurements were still possible. Defendant's officers and agents not only told no one of the encroachment, but probably continued their operations and finally drew the pillars and permitted the superincumbent surface to subside, thereby blotting out to a great extent evidence of the wrongful taking. Defendant either knew of the encroachment or possessed such means of knowing that its conduct in this particular clearly justifies a finding of willful trespass. *Pittsburgh & W. Va. Gas Co.* v. *Pentress Gas Co., supra,* 84 W. Va. 449. Under such circumstances, when the wrongdoer commits the trespass wilfully and with the knowledge that he is invading the rights of others, or under such circumstances as to charge him with knowledge of the character of his act, the measure of damages is the value of the thing mined, after its severance, without deduction of expenses incurred in mining or moving it. *Pittsburgh & W. Va. Gas Co.* v. *Pentress Gas Co., supra,* and other authorities cited above.

The selling price of coal of the quality mined on plaintiff's land during the years 1912 and 1913, as testified to by witnesses for plaintiffs, ranged from $1.00 to $1.57 per ton, or an average of about $1.28. The testimony of defendant's witnesses differs but slightly from these figures. Mr. Robinson, defendant's vice president and general manager from February 1, 1913, until May 1, 1917, testifies that for the years 1912, 1913, and 1914

the selling price of coal averaged $1.18, $1.15 and $1.20, respectively. It is a matter of common knowledge that after those years the price of coal rose materially. But taking the lowest figure furnished by defendant, $1.15, and dividing the total verdict by it, the result obtained shows about 13,000 tons, or 2 3-5 acres, for which compensation is given. This, compared with the 11 acres estimated by plaintiff's engineer as removed or damaged, and the acre and a half practically admitted by defendant's chief engineer, testifying only from the company map, when the probabilities are that the map does not disclose the true extent of the encroachment, cannot be considered unreasonable or excessive in the light of the evidence.

Plaintiff's instruction No. 1, of which defendant complains, was more favorable to it than could reasonably be expected. We see no substantial error in other instructions given or refused.

A plea of the statute of limitations was interposed in the court below, but defendant has not insisted upon it with much vigor in this court. Summons in the suit issued March 28, 1918, whereas defendant's map disclosing the trespass to plaintiffs' coal was prepared in January, 1913, and showed the encroachments as they existed on that date. There is evidence, however, referred to above, that the acts of trespass did not cease at that time but continued. That is not material here, however, for in an action for the unlawful removal of coal by wrongfully extending a mine into adjoining property, it is generally held that the statute begins to run only from the time of actual discovery of the trespass, or the time when discovery was reasonably possible. As said in 1 Barringer & Adams, Mines & Mining, pp. 690-691: "Subterranean trespasses are peculiarly susceptible of concealment from the injured owner, and it is generally within the power of the trespasser, by failing to disclose the trespass, to prevent the other party from asserting his right to redress within the statutory period. Such action on the part of the trespasser is fraudulent, and suspends the running of the statute until such time as the injured party discovers, or reasonably could have discovered, the trespass." See also *Lewey* v. *H. C. Fricke Coke Co.,* 166 Pa. St. 536; *Kingston* v. *Lehigh Valley Coal Co.,* 241 Pa. St. 469; 17 R. C. L. p. 792, §159

Finding no error warranting reversal of the judgment, we affirm it.

*Affirmed.*