WESTERN POCAHONTAS CORPORATION, a corporation, Plaintiff,

v.

EASTERN GAS AND FUEL ASSOCIATES, a Massachusetts voluntary association, Defendant.

Albert H. COLE, Fred Lindsey and Luther E. Woods, Trustees of the Cole and Crane Real Estate Trusts, Plaintiffs,

v.

EASTERN GAS AND FUEL ASSOCIATES, a Massachusetts voluntary association, Defendant.

Civ. A. Nos. 2670, 2667.

United States District Court
S. D. West Virginia,
Charleston Division.

Jan. 9, 1963.

---

Edwin W. Conley, Fitzpatrick, Huddleston, Bolen & Hudgins, Huntington, W. Va., for plaintiff Western Pocahontas Corp.

Selden S. McNeer, Campbell, McNeer, Woods, Bagley & Emerson, Huntington, W. Va., for plaintiffs Albert H. Cole, Fred Lindsey and Luther E. Woods, Trustees of the Cole and Crane Real Estate Trusts.

John O. Kizer, Woodroe, Kizer & Steed, Charleston, W. Va., for defendant.

FIELD, Chief Judge.

The plaintiffs in each of these cases seek to recover damages and statutory penalties for alleged encroachments, underground trespass and removal of coal from their properties by the defendant, Eastern Gas and Fuel Associates. The defendant has moved for summary judgment in each of these cases on the ground that the claims for statutory penalties are barred by the one-year statute of limitations contained in West Virginia Code, Chapter 55, Article 2, Section 12(c), and that the claims for the trespass and wrongful removal of coal are barred by the statute of limitations of two years as contained in West Virginia Code, Chapter 55, Article 2, Section 12 (a). Affidavits have been filed in support of these motions on behalf of the defendant and affidavits in opposition thereto have been filed by the plaintiffs. These affidavits together with the pleadings and answers to certain interrogatories indicate that there are no genuine issues as to any facts material to the disposition of the motions upon the grounds assigned therein.

The facts which are undisputed or taken to be true for the purposes of consideration of these motions are found to be as follows. Eastern Gas and Fuel Associates, hereinafter referred to as

"Eastern," has been the lessee of 6,217.27 acres of coal land situate in Boone County, West Virginia, referred to as the Shephard Tract, since January 1, 1928, and has conducted mining operations in the Hernshaw Seam of coal in that tract from the year 1928 down to the present time. The northerly line of the Shephard Tract is a line commonly known and referred to as the Rutter and Etting line, being the north line of the Rutter and Etting Great Lots 23 and 27 of which the Shephard Tract is a part. These Great Lots were a part of a tract of 174,673 acres patented to Thomas Rutter and Reuben Etting by the Commonwealth of Virginia in the year 1796. The call for this line in the original patent was "S 66° W 3760 poles." On its face, of course, this called for a straight line of approximately 12 miles, but from an engineering standpoint no straight line of that length could be run by compass bearings. Accordingly, in the year 1840, pursuant to a decree of the Circuit Court of Fayette County, Virginia, the land was resurveyed and monumented approximately every one-half mile. A number of these monuments are still recognizable and in fact several were located on the ground by plaintiff's engineer, and it would appear that the Rutter and Etting line can now be definitely located by reference to these monuments.

The Rutter and Etting line is the common property line between the Shephard Tract and a tract of 520 acres owned by the Cole and Crane Real Estate Trust as well as the tract of 1400 acres owned by Western Pocahontas Corporation. Likewise Monument 3 as shown on the map filed with the affidavit of McCoy is located on the Rutter and Etting line and is a common corner to the acreage owned by Cole and Crane, Western Pocahontas and the Shephard Tract.

The northerly line of the Shephard Tract was plotted and placed on the various maps showing the mining operations of Eastern in the Shephard Tract as called for under the various instruments covering its lease of that tract. During the years 1943 through 1947 Eastern conducted operations in the Hernshaw Seam immediately adjacent to this northerly line of the Shephard Tract as plotted by it in the area of the Cole and Crane tract of 520 acres. During those years Eastern avoided any mining operations within five feet of the common property line as plotted by it nor did it cross this property line as established on its maps. The mining of coal adjacent to this property line was completed on June 30, 1947, and no coal has been mined adjacent to the property line as thus established since June 30, 1947. By agreement dated January 1, 1949, Cole and Crane leased the tract of 520 acres to Eastern for coal mining purposes. The description of the tract as leased called for the Rutter and Etting line as its southerly boundary. Eastern commenced mining operations in the Hernshaw vein on this tract of land in July, 1949 and conducted mining operations adjacent to the common property line as plotted by Eastern during the years 1949 through June 11, 1953. No mining operations have been conducted by Eastern on the Cole and Crane property adjacent to the common property line as plotted by Eastern since June 11, 1953.

During the years 1943 through July 1, 1947, Eastern likewise conducted mining operations in the Hernshaw Seam adjacent to the northerly line of the Shephard Tract as plotted by it in the area of the tract of land owned by Western Pocahontas. During these years Eastern avoided the conduct of mining operations within five feet of the property line as so established nor did it conduct any mining operations which crossed this common property line as reflected on its maps. By agreement dated July 1, 1947, Western Pocahontas leased the Hernshaw vein of coal lying under the 1400 acres owned by it to Eastern for coal mining purposes. The description of the land so leased called for the Rutter and Etting line as its southerly boundary.

Eastern commenced mining operations in the Hernshaw Seam under this lease on September 30, 1947. Eastern con-

ducted mining operations in this seam on the land of Western Pocahontas adjacent to the common property line to the Shephard Tract as established by Eastern during the years 1949 to April, 1953. In April, 1953, Eastern ceased its mining operations adjacent to this property line. A little over six years later, on June 2, 1959, Eastern resumed its mining operations on the Western Pocahontas tract adjacent to the common property line as established by Eastern, and mining operations have been conducted by Eastern on the Western Pocahontas tract continuously from June 2, 1959, to the present date. Subsequent to the execution of the lease from Western Pocahontas to Eastern on July 1, 1947, Eastern also continued to mine coal on the Shephard Tract adjacent to the common property line as established by Eastern. The mining of coal on the Shephard Tract adjacent to this common property line was completed on August 30, 1959, and no coal has been mined in that area by Eastern since that date.

During the years of its operations, Eastern has paid royalty on all coal removed by it from the Shephard Tract to the owners of that tract or their representatives including royalty payments for coal mined adjacent to the common property line as plotted by Eastern between the Shephard Tract and the property owned by the plaintiffs. Copies of its mine maps showing the Rutter and Etting common property line as plotted by Eastern as well as the mining operations immediately adjacent to this line were filed annually with the West Virginia Department of Mines as required by law. Also after commencing mining operations on the properties owned by the plaintiffs, pursuant to the lease requirements, copies of mine maps showing mining operations of Eastern on the acreage owned by Cole and Crane and Western Pocahontas, respectively, were filed with the lessors on a quarterly basis. All of these maps carried the location of the Rutter and Etting line as it had been plotted by Eastern for many years. Prior to 1960,

the mine maps submitted by Eastern to Cole and Crane and Western Pocahontas indicated the common property line between Cole and Crane and Western Pocahontas in pencil on said maps. These pencilled lines were changed from time to time and were assumed by the plaintiffs to represent the tentative location of the common property line between them. Plaintiffs apparently did not consider these pencilled lines significant for the reason that no mining operations were being conducted by Eastern at those times in the vicinity of the common property line between Cole and Crane and Western Pocahontas.

In February, 1960, a map was received by the plaintiffs from Eastern which carried the common property line between Western Pocahontas and Cole and Crane in ink and which the lessors assumed to be intended by Eastern as a permanent line between the two tracts. This location of the common property line between Western Pocahontas and Cole and Crane on Eastern's map in January, 1960, raised some question in the minds of the engineers of the plaintiffs as to the accuracy of the location of the Rutter and Etting line by Eastern on its mine maps. Accordingly, in February, 1960, a representative of one of the plaintiffs met with an engineering representative of defendant and they discussed the question of the location of the Rutter and Etting line. The question was further discussed between representatives of the plaintiffs and of Eastern in Pittsburgh in May, 1960. At that meeting the representatives of the plaintiffs indicated that there was some question in their minds about the accuracy of Eastern's location of the Rutter and Etting line, and the discussion apparently was conducted in an atmosphere of attempting to reach some settlement relative to the true location of the line.

In November, 1960, the plaintiffs employed J. M. McCoy, a registered mining engineer, for the purpose of making an accurate field survey of the Rutter and Etting line to determine whether or not Eastern, in conducting its mining opera-

tions under the Shephard lease, had encroached upon the lands of Western Pocahontas and Cole and Crane, or either of them. Mr. McCoy did an extensive amount of research and commenced his fieldwork in late February, 1961. After conducting his fieldwork, it was necessary for McCoy to correlate his findings with the mining operations and maps of Eastern, and he made a final report to Western Pocahontas and Cole and Crane on August 16, 1961. McCoy's survey showed the Rutter and Etting line as plotted by Eastern and as shown on their mine maps was, in fact, roughly 160 feet to the north of the true Rutter and Etting line. As a result of this error in location of the common property line, McCoy's survey showed that Eastern had encroached upon the land of Western Pocahontas in the conduct of its Shephard lease operations to the extent of 15.47 acres and had likewise encroached upon the land of Cole and Crane to the extent of 18 acres.

The leases between the plaintiffs and Eastern required that the lessee employ a competent mining engineer to make periodic mine surveys giving directions and courses of entries and other particulars of the mining operation, and to make accurate maps thereof which would be subject to the inspection of the lessors. The maps furnished by Eastern to the plaintiffs were made pursuant to this requirement of the leases and both Western Pocahontas and Cole and Crane relied upon the maps as certified. While these maps and surveys disclosed the pattern and extent of the mining operations, they could not on their face disclose any possible encroachment. To make such a determination it would have been necessary to conduct a field survey on the surface and correlate it with the mining operations as shown by the maps in the manner employed by Mr. McCoy in 1961. Under their leases, Western Pocahontas and Cole and Crane also had the privilege of making visual inspections of Eastern's mining operations in the Hern-

shaw tract, and such inspections were made by representatives of the lessors commencing soon after the inception of their respective leases and continuing during the entire course of mining operations under said leases. The primary purpose of these inspections was to verify the fact that the lessee was removing all mineable coal of workable thickness and was otherwise using careful and workmanlike mining techniques. Again, while these visual inspections would disclose the physical removal of the coal and the manner in which it had been performed, they would not disclose any encroachments unless they likewise were correlated with a surface survey.

■■ In the area of subterranean trespasses West Virginia subscribes to the rule prevailing generally in this country [1] to the effect that the statute of limitations begins to run only from the time of actual discovery of the trespass, or the time when such discovery was reasonably possible. Petrelli, et al. v. W. Va.-Pittsburgh Coal Co., 86 W.Va. 607; 104 S.E. 103. And in cases such as this where the defendant pleads the statute of limitations as an affirmative defense, the burden rests upon the defendant to show by a preponderance of the evidence that the encroachments were made prior to the statutory period, and also that the plaintiffs either had notice of the encroachment or that discovery thereof could have been made by the use of reasonable diligence at some time prior to such period. See Knight et al. v. Chesapeake Coal Co., 99 W.Va. 261, 128 S.E. 318. In the present cases the plaintiffs contend that whether they knew or in the exercise of reasonable diligence should have known of the alleged trespasses is a question of fact, and that the presence of this factual question precludes summary disposition of these cases under Rule 56. If this question were being considered in the light of the facts as they existed prior to the execution of the leases between the plaintiffs and the defendant in 1947 and 1949, respectively, I would be

1. See Note 37 A.L.R. 1182.

inclined to agree with plaintiffs' position. Under those facts the plaintiffs could well argue that they were in the position of an adjacent landowner who was ignorant of the subterranean trespass and had no available means to ascertain whether such trespass had occurred; and I agree with counsel for the plaintiffs that under such circumstances the right of inspection and survey extended to an adjacent landowner by virtue of West Virginia Code, Chapter 37, Article 5, Section 2, does not deny the landowner the benefit or protection of the rule enunciated in the Petrelli case. This question was clearly considered and passed upon by our Court of Appeals in Burner v. Smith Coal Co., 107 W.Va. 158, 147 S.E. 545, wherein the Court observed that the object of this statute was to protect and not to penalize the owner of the adjacent land.

In the present cases, however, after the execution of the leases between the plaintiffs and defendant, the plaintiffs had the right and opportunity to observe and inspect every aspect of the mining operations of the defendant, and their representatives made numerous visual inspections of the defendant's operations beginning with the year 1947 and continuing down to the present time. In addition to the visual inspection of the physical taking of the coal, maps which showed the ramifications of the defendant's operations were submitted to them quarterly pursuant to the requirements of their respective leases. While it is true the purpose of these inspections and maps was to disclose to the plaintiffs and their representatives the nature of the operations and removal of the coal with respect to the mining conducted pursuant to the leases, nevertheless they obviously disclosed to them the nature and extent of the defendant's operations for the years prior thereto back to the year 1928. In other words we have in these cases the situation where the plaintiffs had full knowledge of the physical taking of the coal through the inspection and observation of the mining operation by which the coal had been taken out,

together with maps which demonstrated the operation as it was extended from time to time. Their delay in bringing these actions for alleged trespass was not due in anywise to any ignorance on their part that the coal had been physically removed, nor was the mining of the coal concealed from them in any way by the defendant. The delay was due to the fact that at least until the year 1960 the plaintiffs labored under a misconception as to the true location of the Rutter and Etting property line; a misconception that to some degree and at least for some period of time apparently was mutual as between them and the defendant. On these facts the question is presented whether a party who has full knowledge of the physical mining of the coal under his land, but who is unaware that it constitutes a trespass by reason of his ignorance as to the location of his property line is entitled to the benefit of the application of the Petrelli doctrine relative to the running of the statute of limitations. In my opinion there is no good reason for the extension of the principle of the Petrelli case to such a situation.

The history of the cases in this area indicates that the reason for tolling the statute of limitations is the recognition of the practical inability of a landowner to know or obtain knowledge of the subterranean trespass. In the case of Lewey v. H. C. Frick Coke Co., 166 Pa. 536, 31 A. 261, 28 L.R.A. 283, which was relied upon by our West Virginia court in the Petrelli case, the Court stated its reasoning as follows at page 262:

"* * * Mere ignorance will not prevent the running of the statute in equity any more than at law; but there is no reason, resting on general principles, why ignorance that is the result of the defendant's conduct, and not of the stupidity or negligence of the plaintiff, should not prevent the running of the statute in favor of the wrongdoer. It seems to be a general doctrine in courts of law that the plaintiff is bound to know of an invasion of the surface of his close. The fact that his land is a

forest, and that the defendant goes into its interior to trespass by the cutting of timber, does not relieve against its operation. What is plainly visible he must see at his peril, unless, by actual fraud, his attention is diverted and his vigilance put to sleep. But ought this rule to extend to a subterranean trespass? The surface is visible and accessible. The owner may know of its condition without trespassing on others, and for that reason he is bound to know. The interior of the earth is invisible and inaccessible to the owner of the surface, unless he is engaged in mining operations upon his own land; and then he can reach no part of his own coal stratum except that which he is actually removing. If an adjoining landowner reaches the plaintiff's coal through subterranean ways that reach the surface on his own land and are under his actual control, the vigilance the law requires of the plaintiff upon the surface is powerless to detect the invasion by his neighbor of the coal 100 feet under the surface.

" * * * The title of the plaintiff extends from the surface to the center, but actual possession is confined to the surface. Upon the surface he must be held to know all that the most careful observation by himself and his employés could reveal, unless his ignorance is induced by the fraudulent conduct of the wrong-doer. *But in the coal veins, deep down in the earth, he cannot see. Neither in person nor by his servants nor employés can he explore their recesses in search for an intruder. If an adjoining owner goes beyond his own boundaries in the course of his mining operations, the owner on whom he enters has no means of knowledge within his reach. Nothing short of an accurate survey of the interior of his neighbor's mines would enable him to ascertain the fact. This would require the services of a competent mining*

*engineer and his assistants, inside the mines of another, which he would have no right to insist upon.* To require an owner, under such circumstances, to take notice of a trespass upon his underlying coal at the time it takes place, is to require an impossibility; and to hold that the statute begins to run at the date of the trespass is in most cases to take away the remedy of the injured party before he can know that an injury has been done him. A result so absurd and so unjust ought not to be possible." [Emphasis supplied.]

■ The plain import of this language is that it is the ignorance or lack of knowledge of the physical fact of the trespass which tolls the running of the statute. This view of the reasoning in the Frick case seems to be borne out by the later Pennsylvania case of Noonan v. Pardee, 200 Pa. 474, 50 A. 255, 55 L.R.A. 410. In that case there had been a severance of the surface from the mineral ownership and the owner of the surface was suing the owner of the mineral interest for damages resulting from subsidence. In holding that the statute of limitations ran from the date when the coal was improperly removed rather than the time when the surface actually caved in as a result of the lack of support, the Court distinguished the Lewey case in the following language:

" * * * Lewey v. Coke Co. was where the defendant from an adjoining mine had mined and removed the plaintiff's coal underneath his land, yet did not disclose the fact, and plaintiff did not discover it until after the six years had run. We held, on the facts of that case, that the statute only began to run from the time of plaintiff's discovery, and this on the grounds that the mining of his coal was a wrong, and the concealment of the wrong a fraud. *He had no means of discovery; had no right of access to the mine to make observations,* and defendant no right at all under his land; he had no reason to suspect or presume that

one who had no claim of right would wrongfully enter on his land, and dig his coal. But here the parties who mined this coal had a right so to do; a right reserved by the original owner. The surface owner, too, had a right of sufficient support. These mutual rights gave the surface owner access to the mine to see that his right was being maintained by the performance of the duty owing to him by the coal operator." [Emphasis supplied.]

The distinction in the Noonan case lends support to the view that it is the lack of knowledge on the part of the landowner coupled with the physical inability to discover the taking of the coal which furnishes the basis for the application of the principle that the statute should be tolled until actual discovery of the trespass or reasonable means for discovery exist. The factual recital in the Petrelli case demonstrated that the plaintiff there had no knowledge of the physical trespass until within a year prior to the institution of his action. In my opinion if the landowner has knowledge of the actual physical taking of the coal and fails to institute his action within the statutory period through ignorance of his rights due to a misconception on his part as to the location of his property line he cannot bring himself within the ambit of the principle set forth in the Petrelli case. Mere ignorance on the part of a party of an actionable wrong or that a cause of action exists does not suspend the operation of the statute of limitations. Scott v. Rinehart and Dennis Co., 116 W.Va. 319, 180 S.E. 276; Harper v. Harper, 4 Cir., 252 F. 39.

Counsel for plaintiffs contend however that Eastern furnished them maps under their leases which were false or concealed the true location of the Rutter and Etting line, and that such concealment by Eastern should toll the running of the statute. This might well be true as to any trespasses or encroachments which occurred after the effective dates of the respective leases. However it does not ameliorate the position of the plaintiffs with respect to trespasses which occurred prior to the leases. When the representatives of the plaintiffs made their visual inspection of the defendant's mining operations in the Hernshaw Seam they observed or had an opportunity to observe the extent of those operations which had been conducted from the year 1928 down to the date of the initial inspections. It was at that time that they knew or in the exercise of reasonable diligence should have known of the taking of the coal and the extent thereof. With respect to the operations prior to the dates of these leases the parties were adversary and at arms length rather than in the relationship of landlord and tenant, and to my mind the responsibility then rested upon the plaintiffs to determine their existing rights, if any, growing out of the defendant's past operations, and to take the necessary steps to protect those rights. Their failure to do so within the statutory period bars their right of recovery.

It is my opinion that as to the claim of Cole and Crane the statutory period began to run from January 1, 1949, the date of its lease to defendant; and likewise as to Western Pocahontas, the period of limitations began to run from the date of its lease in the year 1947. Consequently, it is my finding that defendant's motion for summary judgment in the Cole and Crane case should be granted in its entirety. The motion for summary judgment in the case of Western Pocahontas will be granted relative to any encroachments or taking of coal prior to July 1, 1947, the date of its lease with defendant. The claim of Western Pocahontas for an accounting for royalties on coal allegedly removed subsequent to its lease in 1947 is reserved for further consideration.

Counsel may prepare an appropriate order incorporating this opinion by reference therein.