487 S.E.2d 901

Timothy **GAITHER**, Plaintiff Below, Appellant,

v.

**CITY HOSPITAL, INC.**, Defendant Below, Appellee.

No. 23401.

Supreme Court of Appeals of West Virginia.

Submitted Jan. 15, 1997.

Decided Feb. 24, 1997.

Laura R. Rose, Rose & Associates, Martinsburg, for Appellant.

Curtis G. Power, III, William E. Galeota, Steptoe & Johnson, Martinsburg, for Appellee.

STARCHER, Justice:

This is an appeal by plaintiff-appellant Timothy Gaither from an October 17, 1995 order of the Circuit Court of Berkeley County that granted summary judgment for the defendant-appellee, City Hospital, Inc. The appellant contends that the circuit court failed to correctly apply the "discovery rule" to his claim, and improperly dismissed his medical malpractice action as barred by the statute of limitation. We agree and reverse the order of the circuit court.

## I.

### Facts and Background

On October 17, 1989, around four o'clock in the morning the then 23–year–old appellant was involved in a single-vehicle motorcycle accident, apparently losing control of his motorcycle on a rain-slick road. He sustained head injuries and a severe fracture to his right leg. Paramedics arrived at the scene several minutes after the accident and transported the appellant to the City Hospital emergency room in Martinsburg, West Virginia. He arrived at the hospital at 4:30 a.m.

City Hospital records reflect that at 9:55 a.m. hospital personnel transferred the appellant to the Maryland Institute for Emergency Medical Services Systems ("Shock Trauma") in Baltimore, Maryland, approximately 90 miles away. Because of bad weather the appellant was transported by

ambulance rather than helicopter. Upon arrival at Shock Trauma, doctors noted that the appellant had no pulse in the lower part of his right leg. The doctors performed vascular surgery to reestablish blood flow to the leg, but by evening the graft of the new artery had failed. Doctors then amputated the appellant's right leg above the knee.

According to deposition testimony by the appellant's parents, Shock Trauma physicians told them that the delay by City Hospital in transporting the appellant to the trauma center might have caused the loss of the appellant's leg. The parents testified they were told by the appellant's doctors that if the appellant had been transported to Shock Trauma sooner, the blood flow to the leg might have been restored. Hospital records from Shock Trauma confirm that the doctors ascribed some of the appellant's adverse result to the time delay in bringing the appellant to Shock Trauma.[1]

The appellant and his parents testified in their depositions that the doctors at Shock Trauma discussed their suspicions about the cause of the loss of the appellant's leg *only* with the parents, and never with the appellant. The appellant's parents say they never told the appellant about their discussions with his doctors. Furthermore, the appellant's parents testified they always avoided

discussing the leg injury with the appellant because such discussions would trigger pain in the remainder of the appellant's leg.[2] The appellant testified he was satisfied with the treatment he received at City Hospital; therefore, after returning home from Shock Trauma, he telephoned City Hospital personnel to thank them for their help. Apparently the appellant perceived no need for his medical records and did not request copies of these records from either medical facility.

The appellant further testified that from the date of his accident until early 1993 he believed that the loss of his leg was caused solely by the motorcycle accident. On January 6, 1993, the appellant visited prosthetic specialist Michael J. Hogan. Mr. Hogan's affidavit reflects that, pursuant to his routine business practice, he asked the appellant "whether he lost his right leg due to trauma or loss of circulation." After this inquiry by Mr. Hogan, the appellant testified he discussed the reason for the loss of his leg with his parents. The appellant contends it was in this discussion that his parents told him for the first time of their conversation with Shock Trauma physicians. Thereafter, he contacted an attorney who requested copies of the appellant's medical records. The appellant testified he read his medical records in late 1993[3] and learned that the doctors at

---

1. The November 2, 1989 discharge summary from the Shock Trauma Center states (with emphasis added):

 The patient was taken to the operating room immediately after stabilization and CT scan of the head which was felt to be consistent with intracranial hemorrhage, not requiring craniotomy ... He went to the operating room for attempted revascularization of the right lower extremity [which] was initially successful using a greater saphanous [sic] vein reverse graft, but later on that evening the graft thrombosed. *It was felt intraoperatively that the patient had irretrievable clots in the arteries of the leg because of time delay from [t]he time of presentation* ...

 The appellant alleges that the nearly six-hour delay by City Hospital in transporting him to Shock Trauma contributed to the loss of his leg. City Hospital denies that its conduct in any way caused or contributed to the appellant's injuries. At oral argument, counsel for City Hospital argued any delay in transporting the appellant was because emergency room personnel were stabilizing the appellant's head injury. Counsel also indicated that the appellant's injuries can be blamed on delays by Shock Trauma Center in

 operating on the appellant, and that the real issue in this case is the appellant's "misplaced belief" that City Hospital committed malpractice. We do not address these matters; they are suited for jury resolution.

2. For example, Alice Faye Gaither, the appellant's mother, testified at her deposition that she never told her son about the doctors' comments, "[b]ecause it was something we didn't talk about. We still don't talk about it, because every time we would start to say something, Tim would say, 'Mom, don't. It makes me thump.' It would go thump, thump, thump. He's in so much pain and we didn't talk about it then and we don't talk about it now."

3. Counsel for the appellant stated in her briefs and at oral argument before this Court that it took nearly one year to obtain the appellant's hospital records. Further, counsel represented that it cost nearly $500 to purchase copies of these records. We note that we can find nothing in the record to indicate if these facts were presented for the circuit court's consideration. However, based upon the existing record these

Shock Trauma believed the delay in his transfer by City Hospital contributed to the loss of circulation in his leg. The appellant filed this malpractice action against City Hospital on January 7, 1994.

City Hospital filed for summary judgment under Rule 56 of the *West Virginia Rules of Civil Procedure*. The hospital cited *W.Va. Code,* 55–7B–4 [1986] and *Cart v. Marcum,* 188 W.Va. 241, 423 S.E.2d 644 (1992), for the proposition that a malpractice action must be filed within two years of the date a plaintiff discovers an injury. Because this action was filed more than four years after the accident, the hospital argued that the appellant's claims should be dismissed.

The hospital maintained that because the appellant knew of his injury (that is, knew that his leg had been amputated) [4] in October 1989, he had a duty to exercise reasonable diligence in determining the cause of his injury, and that the appellant failed to perform any investigation into the cause of his injury. The hospital contended that the appellant failed to request his medical records from the hospital; failed to consult with personnel at City Hospital or Shock Trauma about the causes of his amputation; and failed to ask his parents about their discussions with the doctors. Further, City Hospital took the position there was no proof that hospital personnel had obstructed the appellant's ability to discover this information. City Hospital argued that the appellant failed in his duty to diligently investigate the reason for the loss of his leg, and that he therefore was not entitled to the benefit of the discovery rule.

The circuit court accepted City Hospital's arguments and found the appellant "had available to him all information necessary in order to discover the alleged act of malpractice by City Hospital, within two years from the date of the alleged occurrence, and he was not prevented from obtaining such information by City Hospital or any other party or entity." The circuit court also stated the appellant had full opportunity to speak with his physicians, but "failed to undertake such investigation with[in] two years from the date of his treatment at City Hospital." Therefore, the court found the appellant's claim did not fall within the discovery rule as set forth in *Cart v. Marcum.* The circuit court concluded that all of the appellant's claims were barred by the statute of limitations, and granted summary judgment to City Hospital on October 17, 1995. Mr. Gaither now appeals this ruling by the circuit court.

## II.

### Standard of Review

The controlling question in this appeal is whether summary judgment was appropriate. As we stated in Syllabus Point 1 of *Painter v. Peavy,* 192 W.Va. 189, 451 S.E.2d 755 (1994), we review a circuit court's entry of summary judgment *de novo.* In *Painter v. Peavy,* we again stated the basic rule that:

Under Rule 56(c) of the West Virginia Rules of Civil Procedure, summary judgment is proper only where the moving party shows that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law.

192 W.Va. at 192, 451 S.E.2d at 758. "The circuit court's function at the summary judgment stage is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Id., citing Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202, 213 (1986). "Summary judgment should be denied 'even where there

facts would have no impact on our decision, since we find there was no reason for the appellant to try to obtain these records until January 1993.

**4.** At oral argument before this Court, counsel for the hospital added to this argument, taking the position that the appellant knew in 1989 that doctors had attempted a "revascularization." In light of this knowledge, counsel argued it is unbelievable for the appellant to say he thought he lost his leg to trauma, rather than circulatory problems, until 1993. The deposition testimony of the appellant and his parents suggests that the appellant first learned the hospital's delay contributed to his leg amputation when he read his medical records sometime in late 1993. The conflict between these two positions involves credibility and other factual determinations, issues within the province of a jury.

is no dispute as to the evidentiary facts in the case but only as to the conclusions to be drawn therefrom.'" *Williams v. Precision Coil, Inc.,* 194 W.Va. 52, 59, 459 S.E.2d 329, 336 (1995), *quoting Pierce v. Ford Motor Co.,* 190 F.2d 910, 915 (4th Cir.), *cert. denied,* 342 U.S. 887, 72 S.Ct. 178, 96 L.Ed. 666 (1951). With these summary judgment standards in mind, we address the appellant's arguments.

## III.

### *Discussion*

The appellant argues that the circuit court improperly dismissed his claim as barred by the statute of limitations and that the time limit for filing his claim was tolled by the discovery rule. Therefore, the primary issue raised for our consideration is: when does a plaintiff receive sufficient information under the "discovery rule" to trigger the statute of limitations? The appellant also maintains that summary judgment was inappropriate because different conclusions may be drawn from the evidence regarding when he first learned the loss of his leg may have been the result of malpractice by the appellee Hospital.

■ The parties agree the applicable statute of limitations is found in the Medical Professional Liability Act, *W.Va.Code,* 55–7B–4(a) [1986].[5] The Act requires an injured plaintiff to file a malpractice claim against a health care provider within two years of the date of the injury, or "within two years of the date when such person discovers, or with the exercise of reasonable diligence, should have discovered such injury, whichever last occurs[.]" However, the Act also places an outside limit of 10 years on the filing of medical malpractice claims, regardless of the date of discovery, unless there is evidence of fraud, concealment or misrepresentation of material facts by the health care provider. The Legislature enacted this statutory expression of the "discovery rule" in recognition that, in the area of malpractice actions, "often the plaintiff is not aware of the fact that an injury has been inflicted. In the area of medical malpractice, this is particularly true because the physician's negligence may consist of some improper diagnosis or improper surgery when the plaintiff is unconscious so that he is not aware that there has been an injury." *Jones v. Trustees of Bethany College,* 177 W.Va. 168, 169, 351 S.E.2d 183, 184 (1986).

■ Generally, the statute of limitations begins to run when a tort occurs; however, under the "discovery rule," the statute of limitations is tolled until a claimant knows or by reasonable diligence should know of his claim. Syllabus Point 1, *Cart v. Marcum,* 188 W.Va. 241, 423 S.E.2d 644 (1992). We first recognized the discovery rule in Syllabus Point 4 of *Petrelli v. West Virginia–Pittsburgh Coal Co.,* 86 W.Va. 607, 104 S.E. 103 (1920), a case involving the unlawful removal of coal when the defendant extended an underground mine onto the plaintiff's property. In *Petrelli* we held the statute of limitations would run "only from the time of actual discovery of the trespass, or the time when discovery was reasonably possible." Our holding was limited to mining trespass cases until 1965, when we extended the discovery rule to certain medical malpractice cases. In *Morgan v. Grace Hospital, Inc.,* 149 W.Va. 783, 144 S.E.2d 156 (1965) we held that if a foreign object was negligently left in a patient's body by a doctor, the statute of limitations for a malpractice action would be tolled so long as the patient remained igno-

---

5. *W.Va.Code,* 55–7B–4 [1986] states:

(a) A cause of action for injury to a person alleging medical professional liability against a health care provider arises as of the date of injury, except as provided in subsection (b) of this section, and must be commenced within two years of the date of such injury, or within two years of the date when such person discovers, or with the exercise of reasonable diligence, should have discovered such injury, whichever last occurs: Provided, That in no event shall any such action be commenced more than ten years after the date of injury.

(b) A cause of action for injury to a minor, brought by or on behalf of a minor who was under the age of ten years at the time of such injury, shall be commenced within two years of the date of such injury, or prior to the minor's twelfth birthday, whichever provides the longer period.

(c) The periods of limitation set forth in this section shall be tolled for any period during which the health care provider or its representative has committed fraud or collusion by concealing or misrepresenting material facts about the injury.

rant of the existence of the foreign object. We acknowledged in *Hundley v. Martinez,* 151 W.Va. 977, 988, 158 S.E.2d 159, 166 (1967) that *Morgan* restricted the discovery rule in medical malpractice cases to "foreign object in the body" cases.

In 1978 we analyzed our rulings in *Morgan* and *Hundley,* and concluded that the discovery rule should be extended to all medical malpractice actions. We stated in Syllabus Point 2 of *Hill v. Clarke,* 161 W.Va. 258, 241 S.E.2d 572 (1978) that "[t]he statute of limitations for malpractice begins to run when plaintiff knows or has reason to know of the alleged malpractice." In later cases, we demonstrated the application of the discovery rule. We subsequently emphasized that the focus is on the plaintiff's state of mind, "on whether the injured plaintiff was aware of the malpractice or, by the exercise of reasonable care, should have discovered it." *Harrison v. Seltzer,* 165 W.Va. 366, 371, 268 S.E.2d 312, 314 (1980).

■ Our cases have also extended the discovery rule to other areas of tort law. The discovery rule has been applied to legal malpractice, *Family Savings & Loan, Inc. v. Ciccarello,* 157 W.Va. 983, 207 S.E.2d 157 (1974), *overruled on other grounds, Hall v. Nichols,* 184 W.Va. 466, 400 S.E.2d 901 (1990); to product liability actions, *Hickman v. Grover,* 178 W.Va. 249, 358 S.E.2d 810 (1987); and to claims of invasion of privacy, *Slack v. Kanawha County Housing and Redevelopment Authority,* 188 W.Va. 144, 423 S.E.2d 547 (1992). In Syllabus Point 2 of *Cart v. Marcum,* 188 W.Va. 241, 423 S.E.2d 644 (1992) we abandoned our case-by-case extension of the discovery rule, and held that the discovery rule is applicable to all torts. We stated simply in Syllabus Point 2 that "The 'discovery rule' is generally applicable to all torts, unless there is a clear statutory prohibition of its application."

■ However, we have recognized in our cases interpreting the discovery rule that often an injury or wrong occurs of such a character that a plaintiff cannot reasonably claim ignorance of the existence of a cause of action. In such cases, the burden shifts to the plaintiff to prove entitlement to the benefit of the discovery rule. In these circumstances, we held that:

> Mere ignorance of the existence of a cause of action or of the identity of the wrongdoer does not prevent the running of the statute of limitations; the "discovery rule" applies only when there is a strong showing by the plaintiff that some action by the defendant prevented the plaintiff from knowing of the wrong at the time of the injury.

Syllabus Point 3, *Cart, supra.* This rule was crafted because in some circumstances causal relationships are so well established that we cannot excuse a plaintiff who pleads ignorance. For example, in *Harrison v. Seltzer,* 165 W.Va. at 371, 268 S.E.2d at 315, we listed instances where we believed that "the adverse results of medical treatment are so extraordinary that the patient is immediately aware that something went wrong, such that the statute of limitations will begin to run once the extraordinary result is known to the plaintiff even though he may not be aware of the precise act of malpractice." [6]

To understand the proper application of *Cart* to negligence actions, and how it was misapplied by the circuit court in this case, requires a recitation of its facts. In *Cart,* the plaintiff entered into an oral agreement with one of the defendants, Jefferson, to allow Jefferson to enter the plaintiff's land to cut,

---

**6.** The statute of limitations was triggered, and patients could not benefit from the discovery rule when: the patient underwent a sinus operation and lost sight in his left eye, *Jordan v. United States,* 503 F.2d 620 (6th Cir.1974); the patient suffered sciatic nerve damage from a tonsillectomy, resulting in a "dropped" foot, *Casias v. United States,* 532 F.2d 1339 (10th Cir.1976); a wife became pregnant after her husband's vasectomy, *Christ v. Lipsitz,* 99 Cal.App.3d 894, 160 Cal. Rptr. 498 (Cal.App.1979); or the patient underwent a removal of a cyst on his back and was paralyzed in both legs after the operation, *Steel v. Aetna Life & Casualty,* 304 So.2d 861 (La.App. 1974). Most recently, in *Harrison v. Davis,* 197 W.Va. 651, 478 S.E.2d 104 (1996), we applied *Cart v. Marcum* to a medical malpractice claim and held the discovery rule was not applicable to a plaintiff seriously injured during child delivery. We held the injuries were of such a serious nature, serious enough to result in the death of her child, that a reasonable plaintiff would have investigated whether her injuries were the result of medical negligence.

remove, and sell timber. When Jefferson refused to sign a written contract, the plaintiff became suspicious, fenced off his property, and warned Jefferson not to come onto the property. Jefferson slipped onto the property, took all of the timber he had cut and sold it to sawmills owned by defendants Marcum and Hager. Jefferson fled with the money and was never located. The record established that the conversion of the timber occurred no later than August 9, 1988. The plaintiff visited his property on August 14, 1988, and first discovered the timber was removed. He waited until August 10, 1990 to file a lawsuit against the defendants, at least one day past the applicable two-year statute of limitation.[7] We held the facts in *Cart* established that the plaintiff suspected Jefferson would take the timber in advance of the actual theft, and that the plaintiff "took significant precautions in order to prevent Mr. Jefferson from stealing the timber; however, these precautions were not successful." 188 W.Va. at 246, 423 S.E.2d at 649. Based upon this, we found that the plaintiff "should have known that Mr. Jefferson took his wood and he should have known it at the time of the injury." *Id.*

City Hospital argues under *Cart v. Marcum* that the appellant knew the identity of the "wrongdoer" (the hospital) and knew he had an injury in 1989. However, City Hospital's counsel conceded at oral argument that the appellant did not have any knowledge suggesting the hospital had done anything wrong until 1993, less than one year before the filing of this action. City Hospital nevertheless argues that the appellant's claim should be barred under *Cart* because the plaintiff did not show that City Hospital did anything to prevent the plaintiff from knowing of the wrong at the time of the injury. We believe that this argument misreads and misapplies our holding in *Cart.*

The discovery rule has its origins in the fact that many times an injured party is unable to know of the existence of an injury or its cause. Our holding in *Cart* addresses the opposite situation, where a plaintiff does or should reasonably know of the existence of an injury *and* its cause. In those situations, to take advantage of the discovery rule, a plaintiff must "make a strong showing of fraudulent concealment, inability to comprehend the injury, or other extreme hardship[.]" *Cart,* 188 W.Va. at 245, 423 S.E.2d at 648. Thus, the question in this case is substantially different from that in *Cart.* The case now before us involves an iteration of the former category of cases: the application of the discovery rule where the plaintiff knows of the existence of an injury, but does not know the injury is the result of any party's conduct other than his own. Our holding in *Hickman v. Grover,* 178 W.Va. 249, 358 S.E.2d 810 (1987) is instructive in addressing this and other similar situations.

As stated previously, in *Hickman* we extended the discovery rule to product liability actions. The plaintiff in *Hickman* was injured by an exploding air tank. Mr. Hickman sued the owner of the air tank within two years of the explosion, but did not amend his complaint to sue the air tank manufacturer until six months after the two-year statute of limitation had passed, after the plaintiff's attorney received a report stating the air tank was defective. We allowed Mr. Hickman to proceed with his action against the manufacturer, stating that:

> Justice is not done when an injured person loses his right to sue before he discovers if he was injured or who to sue. . . .
>
> In products liability cases, the statute of limitations begins to run when the plaintiff knows, or by the exercise of reasonable diligence, should know, (1) that he has been injured, (2) the identity of the maker of the product, and (3) that the product

---

7. The statute of limitation for most tort actions is found in *W.Va.Code,* 55-2-12 [1959], which states:

> Every personal action for which no limitation is otherwise prescribed shall be brought: (a) Within two years next after the right to bring the same shall have accrued, if it be for damage to property; (b) within two years next

after the right to bring the same shall have accrued if it be for damages for personal injuries; and (c) within one year next after the right to bring the same shall have accrued if it be for any other matter of such nature that, in case a party die, it could not have been brought at common law by or against his personal representative.

had a causal relation to his injury. This rule in product liability cases will allow the plaintiffs a fair chance to sue, while upholding the purposes behind the statute of limitations.

In a progressive or creeping disease or injury, many plaintiffs will often not realize that they were actually injured. *See, e.g., Louisville Trust Co. v. Johns–Manville Products Corp.*, 580 S.W.2d 497 (Ky.1979) (asbestos). Other plaintiffs will realize they are injured, but have no reason to connect the product with the injury. *See, e.g., Mack v. A.H. Robins Co.*, 573 F.Supp. 149 (D.Ariz.1983) (Dalkon Shield). In both instances, it would be a miscarriage of justice to hold that the plaintiff's claim was barred by the statute of limitations. A plaintiff does not have enough information to sue until he knows that he has been injured, he knows the identity of the maker of the product, and he knows that the product had a causal relation to his injury. Under the new rule, these claims would be protected from the bar of the statute of limitations.

178 W.Va. at 252–53, 358 S.E.2d at 813–14.

 We believe that our elaboration of the discovery rule in *Hickman,* modified slightly, is also applicable to all tort actions including malpractice actions such as those affected by the Medical Professional Liability Act. Accordingly, we hold that in tort actions, unless there is a clear statutory prohibition to its application,[8] under the discovery rule the statute of limitations begins to run when the plaintiff knows, or by the exercise of reasonable diligence, should know (1) that the plaintiff has been injured, (2) the identity of the entity who owed the plaintiff a duty to act with due care, and who may have engaged in conduct that breached that duty, and (3) that the conduct of that entity has a causal relation to the injury. This rule tolls the statute of limitations until a plaintiff, acting as a reasonable, diligent person, discovers the essential elements of a possible cause of action, that is, discovers duty, breach, causation and injury.

 In our holding today, we find on the one hand that knowledge sufficient to trigger the limitation period requires something more than a mere apprehension that something may be wrong. *See Hill v. Clarke,* 161 W.Va. at 262, 241 S.E.2d at 574 ("[P]ain, suffering and manifestation of the harmful effects of medical malpractice do not, by themselves, commence running of the statute of limitation"). Even if a patient is aware that an undesirable result has been reached after medical treatment, a claim will not be barred by the statute of limitations so long as it is reasonable for the patient not to recognize that the condition might be related to the treatment. On the other hand, we do not go so far as to require recognition by the plaintiff of *negligent* conduct. In medical malpractice actions, such a standard is usually beyond the comprehension of a lay person and actually assumes a conclusion that must properly await a legal determination by a jury. Such a requirement would also result in a situation "where the statute of limitations would almost never accrue until after the suit was filed." *Hickman,* 178 W.Va. at 253, 358 S.E.2d at 814. We simply hold that once a patient is aware, or should reasonably have become aware, that medical treatment by a particular party has caused a personal injury, the statute begins.

Other courts have reached like results. For example, the Florida Supreme Court has said that "the nature of the injury, standing alone, may be such that it communicates the possibility of medical negligence, in which event the statute of limitations will immediately begin to run upon discovery of the injury itself. On the other hand, if the injury is such that it is likely to have occurred from natural causes, the statute will not begin to run until such time as there is reason to believe that medical malpractice may possibly have occurred." *Tanner v. Hartog,* 618 So.2d 177, 181–82 (Fla.1993).

 In the great majority of cases, the issue of whether a claim is barred by the statute of limitations is a question of fact for

---

**8.** The 10–year statute of repose found in *W.Va. Code,* 55–7B–4(a)[1986] would constitute such a "clear statutory prohibition." We do not consid-er the application of this statute of repose in this case, because the appellant filed this action well within the time limit.

the jury. "The question of when plaintiff knows or in the exercise of reasonable diligence has reason to know of medical malpractice is for the jury." Syllabus Point 4, *Hill v. Clarke*, 161 W.Va. 258, 241 S.E.2d 572 (1978). *See also*, Syllabus Point 6, *Teter v. Old Colony Co.*, 190 W.Va. 711, 441 S.E.2d 728 (1994) (" 'Where a cause of action is based on tort or on a claim of fraud, the statute of limitations does not begin to run until the injured person knows, or by the exercise of reasonable diligence should know, of the nature of his injury, and determining that point in time is a question of fact to be answered by the jury.' Syllabus Point 3, *Stemple v. Dobson*, 184 W.Va. 317, 400 S.E.2d 561 (1990)").

## IV.

### *Conclusion*

■ Applying our holding to this case, it is clear that the appellant could reasonably have believed that his injuries were solely the result of his motorcycle accident and his own negligence. The appellant certainly knew in October 1989 of the existence of his injury and knew that City Hospital owed him a duty of due care. However, we find nothing in the record to indicate that the appellant had any reason to know before January 1993 that City Hospital may have breached its duty and failed to exercise proper care, or that City Hospital's conduct may have contributed to the loss of his leg.

The hospital also has not shown any circumstances that should have given the appellant any reason to investigate whether malpractice was a cause of the loss of his leg prior to 1993. On the facts of this case, there was no affirmative duty on the part of the appellant to have sought the hospital records earlier than he did, and no duty on the part of the appellant's parents to have informed their adult son of their discussions with his treating physicians. It is therefore irrelevant whether the appellant could have requested the records before 1993, or spoken with his parents about the cause of the loss of his leg. Accordingly, we cannot say as a matter of law that the plaintiff failed to exercise due diligence, and we find that summary judgment by the circuit court was improper.

Our conclusion today is based on reasons of judicial economy, as well as obvious considerations of fairness. The law does not and should not require a patient to assume that his medical provider has committed malpractice, or worse, has engaged in a conspiracy to conceal some misconduct every time medical treatment has less than perfect results. "To hold otherwise would require that whenever any medical treatment fails to promptly return the patient to full health, the patient would necessarily hire attorneys and experts to investigate the possibility of malpractice, lest the statute run. Such wasteful overabundance of caution is not the goal of our statute of limitations." *Szpynda v. Pyles*, 433 Pa.Super. 1, 639 A.2d 1181, 1184–85 (1994).[9]

We acknowledge a strong policy by the Legislature in favor of limiting the time period in which patients may bring actions for negligent medical treatment and its intention to assist medical providers in being free of ·claims after a reasonable period of time in which no action is raised. However, we also recognize that we must provide full effect to the acts of the Legislature, and mere discomfort with the discovery rule is not a valid reason for refusing to toll the limitation period. This is especially so when that tolling period clearly applies.

---

**9.** The facts in *Szpynda* are remarkably similar to the facts in this case. There, on March 1, 1988, the plaintiff crushed his left hand, wrist and forearm when his arm got ·caught in a splicing machine. Defendant Pyles performed reconstructive surgery, but the surgery was unsuccessful, resulting in the loss of use of the hand. The plaintiff subsequently sued the splicing machine manufacturer. During settlement negotiations with the manufacturer, the plaintiff was examined by a physician employed by the manufacturer. This physician told the plaintiff his disability was caused not by the industrial accident, but by an improper surgical procedure by defendant Pyles. The plaintiff filed suit against Pyles two months later in April 1991. The trial court summarily dismissed the action, and the Superior Court reversed, holding the plaintiff was entitled to the benefit of the discovery rule, and that the claim was filed within two years of the first date the plaintiff knew of his injury, and knew it was the result of the defendant's medical treatment and not the industrial accident.

Accordingly, for the reasons discussed above, we reverse the circuit court's order granting summary judgment to the appellee, and remand this case to the circuit court for further proceedings consistent with this opinion.

Reversed and Remanded.

MAYNARD, Justice, dissenting:

I dissent in *Gaither v. City Hospital*, 199 W.Va. 706, 487 S.E.2d 901 (1997), and *Chancellor v. Shannon*, — W.Va. —, 488 S.E.2d 1 (1997), because I believe that, in these opinions, this Court stretches the law in order to disregard the applicable statutes of limitations.

*Gaither* and *Chancellor* both concern statutes of limitations. Although not apparent from some of this Court's recent decisions, statutes of limitations continue to serve an important function in the operation of the law. This court has stated that "[t]he basic purpose of statutes of limitations is to encourage promptness in instituting actions; to suppress stale demands or fraudulent claims; and to avoid inconvenience which may result from delay in asserting rights or claims when it is practicable to assert them." *Morgan v. Grace Hospital, Inc.*, 149 W.Va. 783, 791, 144 S.E.2d 156, 161 (1965) (citations omitted). In *Humble Oil v. Lane*, 152 W.Va. 578, 583, 165 S.E.2d 379, 383 (1969) this Court explained:

Statutes of limitations are statutes of repose. Their object is to compel the exercise of a right of action within a reasonable time.

At one time the attitude of courts was hostile toward the enforcement of statutes of limitations. However, legislative policy in enacting such statutes is now recognized as controlling and courts, fully acknowledging their effect, look with favor upon such statutes as a defense.... "Statutes of limitations are now considered as wise and beneficent in their purpose and tendency; they are looked upon as statutes of repose, and are held to be rules of property vital to the welfare of society. * * * While the courts will not strain either the facts or the law in aid of a statute of limitations, nevertheless it is established

that such enactment will receive a liberal construction in furtherance of their manifest object, are entitled to the same respect as other statutes, and ought not to be explained away."

... [S]tatutes of limitations are favored in the law and cannot be avoided unless the party seeking to do so brings himself strictly within some exception. It has been widely held that such exceptions "are strictly construed and are not enlarged by the courts upon considerations of apparent hardship." (Citations omitted).

Unfortunately, in *Gaither* and *Chancellor*, this Court has resorted to the use of smoke and mirrors and has "explained away" the statutes of limitations.

In *Gaither*, I believe that the Court radically enlarges the discovery rule which was articulated in *Cart v. Marcum*, 188 W.Va. 241, 423 S.E.2d 644 (1992), in order to avoid the applicable statute of limitations. An explanation of the evolution and construction of the discovery rule as set forth in *Cart* is aptly discussed in the majority opinion and will not be reiterated here. I note, however, that in *Cart*, this Court stated that,

by declaring the *existence* of a "discovery rule" we do not eviscerate the statute of limitations: the statute of limitations will apply unless the handicaps to discovery at the time of the injury are great and are largely the product of the *defendant's* conduct in concealing either the tort or the wrongdoer's identity.

*Cart v. Marcum*, 188 W.Va. 241, 245, 423 S.E.2d 644, 648 (1992). The Court further stated:

The "discovery rule," then, is to be applied with great circumspection on a case-by-case basis only where there is a strong showing by the plaintiff that he was *prevented* from knowing of the claim at the time of the injury. The general rule is that mere ignorance of the existence of a cause of action or of the identity of the wrongdoer does not prevent the running of a statute of limitations. In order to benefit from the rule, a plaintiff must make a strong showing of fraudulent concealment,

inability to comprehend the injury, or other extreme hardship:

.... However, special rules apply in a case involving particular hardship or other circumstances justifying different accrual rules.

*Id.* (Footnotes and citation omitted).

I find the distinction made by the majority between *Cart* and the present case to be a spurious one, and I would simply apply the discovery rule statutorily recognized in W.Va.Code § 55–7B–4 (1986), and set forth in *Cart,* to the circumstances of this case. The standard this Court adopts here encourages dilatory behavior rather than diligence and allows a party to sleep on his rights. I agree with the hospital that the appellant simply failed to exercise reasonable diligence in discovering the reason for the loss of his leg. In October 1989, the appellant was aware that his leg had been amputated, and his parents were told by Shock Trauma physicians that the delay by City Hospital in transporting the appellant to the trauma center might have caused the loss of the appellant's leg. Nevertheless, for the next three years, the appellant failed to investigate the reason for his injury. In light of the fact that the appellant is an adult and apparently of at least average intelligence, I find his parents' explanation that they were unable to discuss the appellant's amputation with him preposterous. In addition, the appellant failed to request his medical records from the hospital, and failed to speak with anyone at City Hospital or Shock Trauma concerning the causes of his amputation. I also agree with the circuit court that the appellant "had available to him all information necessary in order to discover the alleged act of malpractice by City Hospital, within two years from the date of the alleged occurrence, and he was not prevented from obtaining such information by City Hospital or any other party or entity," and that the appellant's claim, therefore, did not fall within the discovery rule as set forth in *Cart.* Because I believe that the appellant's claims were, therefore, barred by the applicable statute of limitations, I would affirm the circuit court's grant of summary judgment on behalf of City Hospital.

In *Chancellor,* the appellant was definitively notified on October 23, 1991 that a wire had been improperly left in her body from a previous surgery. The appellant filed suit against the doctor, hospital, and then unknown manufacturer of the wire on October 1, 1993, twenty-two days before the two year statute of limitations would have run on a products liability claim. Only then did the appellant began to seriously seek to determine the identity of the manufacturer. As a result, the appellant's amended complaint specifically naming the manufacturer of the wire as a defendant was filed well outside the two year statute of limitations. The Court managed to reverse the grant of summary judgment on behalf of the manufacturer by reasoning that further inquiry into the steps taken by the appellant's attorney prior to October 1, 1993, alluded to in an affidavit filed by the appellant's attorney, is necessary before summary judgment is appropriate. Again, the Court struggled to find a way to avoid the application of the statute of limitations.

As noted above, according to *Cart,* in order to benefit from the discovery rule, the appellant must make a strong showing of fraudulent concealment, inability to comprehend the injury, or other extreme hardship. If the appellant is able to make such a showing, I fail to understand why the appellant did not present such evidence prior to the circuit court's ruling on the appellee's summary judgment motion. In the absence of such evidence, I agree with the circuit court that:

[Appellant] has not shown that she acted with reasonable diligence; the [Appellant] has not shown that the handicaps to discovery of the identity of [the manufacturer of the wire] were great and has completely failed to show that the handicaps to discovery of the identity of [the manufacturer] were the product of [the manufacturer's] conduct; there has been no showing whatsoever of any fraudulent concealment by [the manufacturer] [.]

In sum, in both *Gaither* and *Chancellor* this Court completely ignores the discovery rule's requirement of reasonable diligence, and, in clear contravention of our case law, rewards plaintiffs who exercised willful ignorance.

In W.Va.Code § 55–7B–4 and W.Va.Code § 55–2–12, the Legislature clearly expressed its will to limit lawsuits. As noted above, statutes of limitations serve several important purposes, one of which is the recognition of the fact that things should be over at some point. Even in the world of legal actions, there should be finality. The public perception is that legal actions take too long, cost too much, and never end. Decisions such as *Gaither* and *Chancellor* only serve to encourage that belief. For these reasons, I believe that it is improper for this Court to so blatantly ignore legislative enactments of statutes of limitations.

Also, I cannot help but think that the Court's eagerness to disregard the statute of limitations in *Gaither* stemmed at least in part from the fact that the defendant was a hospital. The trend in this Court is to transform hospitals into insurance companies and make them the insurers of everyone on the premises. One problem with this is that most hospitals in West Virginia no longer have deep pockets. According to the Center for Rural Health Development, today there are thirty-one small rural hospitals representing about half of all hospitals in West Virginia. Small rural hospitals are characterized as those with fewer than 100 beds, fewer than 5,000 admissions annually, and located in a rural community with fewer than 10,000 persons. As a group, the small, rural hospitals in West Virginia showed a profit of –1.7% in 1991, 0.1% in 1992, –1.6% in 1993, 1.8% in 1994 and 3.7% in 1995. This is not to suggest that larger hospitals in the state have significantly deeper pockets. For the same time period, all hospitals in the state showed a profit of –0.6% in 1991, 1.7% in 1992, –0.2% in 1993, 2.1% in 1994, and 4.5% in 1995. Thirteen of the 55 acute care facilities in the state lost money in 1995, with 33 of the 55 earning below the average statewide profit margin.[1] "Profit" is not really an accurate term and is probably a bad word to use because in present day West Virginia profit has been unfairly given a bad connotation. Further, many of the state's hospitals, including City Hospital in the case at bar, are public, non-profit hospitals.

The above figures illustrate that by unfairly exposing hospitals to damage awards in tort claims which have really expired, this Court could be threatening the health and very existence of many small, struggling hospitals. The result will be a loss of access to quality medical care in West Virginia's countless rural communities. This could be partially prevented if the Court would simply uphold the statutes of limitations wisely enacted by the Legislature.

The Court denied that *Cart* would "eviscerate" the statute of limitations. I think that word means to cut out the guts or disembowel. If so, our statute of limitations now looks like the inside of a slaughterhouse, with the blood and guts of the statute splattered everywhere. This Court, with its decisions in *Cart, Gaither and Chancellor,* have created an abattoir out of our statute of limitations jurisprudence and have ground up the statute and made it into judicial sausage.

---

1. Some of the above information concerning hospitals in West Virginia is contained in a report compiled by the West Virginia Hospital Association in cooperation with the Center for Rural Health Development titled *Rural Hospitals in West Virginia: Making the transition* (October 1996).