663 S.E.2d 623

**R. Brooks LEGG, Jr., D.D.S., Plaintiff Below, Appellant**

v.

**Richard C. RASHID, M.D., Defendant Below, Appellee.**

**No. 33521.**

Supreme Court of Appeals of West Virginia.

Submitted Feb. 26, 2008.

Decided May 28, 2008.

---

Wayne King, Esq., Clay, for Appellant.

Bruce L. Freeman, Esq., Freeman & Chiartas, Charleston, and Kent J. George, Esq., W. Bradley Sorrells, Esq., Robinson & McElwee, PLLC, for Appellee.

PER CURIAM:

This case is before this Court upon appeal of a final order of the Circuit Court of Kanawha County entered August 22, 2006. In that order, the circuit court granted summary judgment in favor of the appellee and defendant below, Dr. Richard C. Rashid, M.D., finding that the appellant and plaintiff below, R. Brooks Legg, Jr., D.D.S., filed his medical malpractice complaint against Dr. Rashid beyond the statute of limitations period. Based upon the parties' briefs and arguments in this proceeding, as well as the relevant statutory and case law, we are of the opinion that the circuit court did not commit reversible error and accordingly, affirm the decision below.

## I.

### FACTS

In August 1996, the appellant, Dr. R. Brooks Legg, Jr., a practicing dentist who wore hard contact lenses due to poor vision, decided to have a corrective surgical procedure to enhance his vision. He contacted Dr. Richard C. Rashid, the appellee, regarding Automated Lamellar Keratoplasty (hereinafter, "ALK"), which was a type of corrective vision surgery commonly performed at that time.

In January 1997, Dr. Rashid performed ALK surgery on Dr. Legg's left eye. Upon removing his eye patch the next day, Dr. Legg realized immediate loss of vision in that eye. Due to the fact that his vision was so poor, Dr. Rashid performed a second procedure two weeks later intended to give Dr. Legg his desired vision correction. Following the second procedure, Dr. Legg received no significant improvement and had difficulty

wearing a contact lens in his left eye. According to Dr. Legg, it was then that Dr. Rashid informed him that further procedures would be necessary to correct his vision; however, the necessary procedures were not yet available in the United States. Dr. Rashid said that he did not know when the procedures would be available.

In the spring of 2001, Dr. Legg consulted with Dr. Michael Harris who informed him that he was unable to fit a contact lens in Dr. Legg's left eye due to corneal irregularities caused by the surgeries he underwent in January 1997. Then, in December 2002, Dr. Legg consulted Dr. Lee Wiley, who explained to him that before the cornea can be measured for surgical correction, the patient must stop wearing contact lenses for one to two months to allow the cornea to revert to its natural curvature. Dr. Legg states that this information was not disclosed to him by Dr. Rashid prior to his 1997 eye surgery. Moreover, Dr. Legg maintains that he had not worn his contacts for a period of only seventy-two hours prior to surgery and that Dr. Rashid failed to have him remove his hard-contact lens for a longer period of time consistent with the standard of care for performing an ALK.

On June 9, 2005, Dr. Legg filed a lawsuit against Dr. Rashid alleging damages arising from the surgical procedures performed by Dr. Rashid in January 1997. On August 22, 2006, the circuit court granted summary judgment in Dr. Rashid's favor concluding that the action had been filed beyond the two-year statute of limitations provided by W.Va.Code § 55–7B–4(a). This appeal followed.

## II.

## STANDARD OF REVIEW

In this case, Dr. Legg appeals the circuit court's summary judgment order dismissing his medical malpractice claim against Dr. Rashid. In Syllabus Point 1 of *Painter v. Peavy*, 192 W.Va. 189, 451 S.E.2d 755 (1994), this Court held that: "A circuit court's entry of summary judgment is reviewed *de novo*." We have also held that, "A motion for summary judgment should be granted only when it is clear that there is no genuine issue of fact to be tried and inquiry concerning the facts is not desirable to clarify the application of the law." Syllabus Point 3, *Aetna Casualty & Surety Co. v. Federal Ins. Co. of New York*, 148 W.Va. 160, 133 S.E.2d 770 (1963). In Syllabus Point 2 of *Williams v. Precision Coil, Inc.*, 194 W.Va. 52, 459 S.E.2d 329 (1995), this Court explained that,

Summary judgment is appropriate if, from the totality of the evidence presented, the record could not lead a rational trier of fact to find for the nonmoving party, such as where the nonmoving party has failed to make a sufficient showing on an essential element of the case that it has the burden to prove.

With these principles in mind, we now consider the parties' arguments.

## III.

## DISCUSSION

Dr. Legg filed a medical malpractice claim against Dr. Rashid on June 9, 2005. Dr. Legg maintains that the statute of limitations began to run on the date he actually discovered the medical negligence committed by Dr. Rashid. He further states that the earliest possible date that could have occurred was July of 2003 when he called for an appointment with Dr. Wiley. He states that it was at this time when Dr. Wiley informed him of the need to leave hard contact lenses out for four weeks prior to any procedure. Thereafter, according to Dr. Legg, he filed his medical malpractice claim in June 2005, which was within the two-year limitation from when he argues that he discovered the injury.

Dr. Legg states that summary judgment was not proper in this case and points to Syllabus Point 5 of *Gaither v. City Hospital*, 199 W.Va. 706, 487 S.E.2d 901 (1997), wherein this Court stated that "[t]he question of when plaintiff knows or in the exercise of reasonable diligence has reason to know of medical malpractice is for the jury. Syllabus Point 4, *Hill v. Clarke*, 161 W.Va. 258, 241 S.E.2d 572 (1978)." Dr. Legg then cites Syllabus Point 3 of *Miller v. Monongalia*

*County Board of Education,* 210 W.Va. 147, 556 S.E.2d 427 (2001), which holds that "[f]raudulent concealment requires that the defendant commit some positive act tending to conceal the cause of action from the plaintiff, although any act or omission tending to suppress the truth is enough."

Dr. Legg asserts that throughout the years, Dr. Rashid made him believe that his vision problems were temporary and could be improved by a cutting-edge, computer-assisted surgery when it became available. Consequently, Dr. Legg states that the circuit court committed error in granting summary judgment to Dr. Rashid based upon the erroneous belief that the medical malpractice action filed by Dr. Legg was time-barred by the applicable statute of limitations.

Conversely, Dr. Rashid states that Dr. Legg was aware of his injury as soon as the bandages were removed from his eye on January 14, 1997, and that he had no reasonable basis to believe that his injury was caused by anything other than the treatment. As such, Dr. Rashid maintains that the statute of limitations began to run on that day and expired on January 14, 1999, and Dr. Legg's June 9, 2005, filing of a claim against him, which was more than six years later, was well outside of the statute of limitations. Accordingly, Dr. Rashid maintains that under the facts and circumstances of this case, summary judgment was proper.

Dr. Rashid further asserts that Dr. Legg was incorrect when he stated that the statute of limitations was tolled "until at least July 2003, when Dr. Legg learned from [Dr. Wiley] that the pre-operative procedure of Dr. Rashid was the source of the unsuccessful procedure performed in 1997." In that regard, Dr. Rashid states that the appointment

with Dr. Wiley was actually on December 10, 2002, and not in July 2003 as claimed by Dr. Legg. Thus, as the circuit court pointed out in its order, Dr. Legg's "consultation [with Dr. Wiley] occurred in December, 2002. more than two years prior to the filing of his Complaint," which makes it clear that Dr. Legg was time-barred by the applicable statute of limitations regardless of whether Dr. Rashid's actions tolled the statute.

■ At the outset, we note that our review here is simply limited to determining whether the circuit court properly granted summary judgment. In Syllabus Point 3 of *Painter, supra,* we stated: "The circuit court's function at the summary judgment stage is not to weigh the evidence and determine the truth of the matter, but is to determine whether there is a genuine issue for trial." 192 W.Va. 189, 451 S.E.2d 755. Having reviewed the entire record, we find that the circuit court properly granted summary judgment because the evidence shows that Dr. Legg filed his medical malpractice action beyond the statute of limitations as provided by W.Va.Code § 55–7B–4(a).[1]

■ As we have explained,

[t]he Medical Professional Liability Act, W.Va.Code, 55–7B–4(a) [1986] . . . requires an injured plaintiff to file a [medical] malpractice claim against a health care provider within two years of the date of the injury, or 'within two years of the date when such person discovers, or with the exercise of reasonable diligence, should have discovered such injury, whichever last occurs [.]'

Syllabus Point 1, in part, *Gaither v. City Hospital, Inc.,* 199 W.Va. 706, 487 S.E.2d 901

---

1. W.Va.Code § 55–7B–4, provides:

(a) A cause of action for injury to a person alleging medical professional liability against a health care provider arises as of the date of injury, except as provided in subsection (b) of this section, and must be commenced within two years of the date of such injury, or within two years of the date when such person discovers, or with the exercise of reasonable diligence, should have discovered such injury, whichever last occurs: Provided, That in no event shall any such action be commenced more than ten years after the date of injury.

(b) A cause of action for injury to a minor, brought by or on behalf of a minor who was under the age often years at the time of such injury, shall be commenced within two years of the date of such injury, or prior to the minor's twelfth birthday, whichever provides the longer period.

(c) The periods of limitation set forth in this section shall be tolled for any period during which the health care provider or its representative has committed fraud or collusion by concealing or misrepresenting material facts about the injury.

(1997). Ordinarily, the applicable statute of limitation begins to run when the actionable conduct first occurs, or when an injury is discovered, or with reasonable diligence, should have been discovered. W.Va.Code § 55–7B–4. The discovery rule recognizes "the inherent unfairness of barring a claim when a party's cause of action could not have been recognized until after the ordinarily applicable period of limitation." *Harris .v. Jones,* 209 W.Va. 557, 562, 550 S.E.2d 93, 98 (2001). "[U]nder the 'discovery rule,' the statute of limitations is tolled until a claimant knows or by reasonable diligence should know of his claim." Syllabus Point 2, in part, *Gaither v. City Hospital, Inc.,* 199 W.Va. 706, 487 S.E.2d 901 (1997).

■ There are two common situations when the discovery rule may apply. The first occurs when "the plaintiff knows of the existence of an injury, but does not know the injury is the result of any party's conduct other than his own." *Gaither,* 199 W.Va. at 713, 487 S.E.2d at 908 (modifying *Hickman v. Grover,* 178 W.Va. 249, 358 S.E.2d 810 (1987)). In Gaither, this Court held that a question of fact existed as to when Mr. Gaither first "became aware" that the hospital's negligence, as opposed to his own negligence, might have resulted in the amputation of his leg. We explained that: "We find nothing in the record to indicate that the appellant had any reason to know before January 1993 that City Hospital may have breached its duty and failed to exercise proper care, or that City Hospital's conduct may have contributed to the loss of his leg." 199 W.Va. at 715, 487 S.E.2d at 910.

The second situation may occur when an individual "does or should reasonably know of the existence of an injury *and* its cause." *Gaither,* 199 W.Va. at 713, 487 S.E.2d at 908. In footnote 6 of *Gaither,* this Court lists instances where "causal relationships are so well-established [between the injury and its cause] that we cannot excuse a plaintiff who pleads ignorance." These instances include a patient who, after having a sinus operation, lost sight in his left eye, and a patient who, after undergoing a simple surgery for the removal of a cyst, was paralyzed in both legs. *Gaither,* 199 W.Va. at 712, 487 S.E.2d at 907

(internal citations omitted). In such instances, when an individual knows or should reasonably know of the injury and its cause, the injured party must "make a strong showing of fraudulent concealment, inability to comprehend the injury, or other extreme hardship" for the discovery rule to apply. 199 W.Va. at 713, 487 S.E.2d at 908 (*quoting Cart v. Marcum,* 188 W.Va. 241, 245, 423 S.E.2d 644, 648 (1992)).

As discussed, Dr. Legg argues that the circuit court erred in finding that the statute of limitations began to run on January 14, 1997, instead of July, 2003. The circuit court, however, rejected Dr. Legg's argument as it explained:

> In the case at bar, [Dr. Legg] expressly admits immediately recognizing his injury the day after his surgery in January 1997. There is no allegation of fraudulent concealment by the defendant and the Court finds no evidence thereof. The plaintiff was specifically informed by Dr. Rashid that his condition will not improve without further surgical procedures which were not available in this country and no time frame was given in which they would become available. [Dr. Legg] was further advised by Dr. Harris of the relationship between the January 1997 surgeries and plaintiff's difficulty wearing contact lenses. As noted in *Gaither,* when an injury occurs of such a character that the plaintiff cannot reasonably claim ignorance of the existence of a cause of action, the burden shifts to the plaintiff to prove entitlement to the benefit of the discovery rule. The plaintiff herein has not carried that burden.

The circuit court further explained:

> [Dr. Legg] argues that under Dr. Rashid's care he was told to leave his contact lenses out for only a few days prior to his surgery, which is contrary to the information provided in his consultation with Dr. Wiley. Jt is this event, according to the plaintiff, which is the earliest date when the statute of limitations begins to run. This argument fails for two reasons. First, that consultation occurred in December 2002, more than two years prior to the filing of his Complaint. Secondly, the West Virginia Supreme Court of Appeals

has been clear that where the adverse results of medical treatment are so extraordinary that the patient is immediately aware that something went wrong, the statute of limitations will begin to run even though he may not be aware of the precise act of malpractice. *Harrison v. Seltzer,* 165 W.Va. 366, 371, 268 S.E.2d 312, 315 (1980).

Dr. Legg's own testimony was that on the day after his January 13, 1997, surgery, that he "immediately realize[d] that the [procedure] had not corrected his vision, and had in fact greatly diminished his vision when he removed the bandage from his eye on January 14, 1997." Dr. Legg testified as follows:

Q. Tell me what you recall about removing the eye patch the next morning.

A. I couldn't even see the door. It was really terrible vision. Really, really terrible. And I had patients scheduled for the following day, and I thought I was going to have a heart attack.

Q. What had you been told to expect when you removed your eye patch?

A. A little blurriness, a little double vision, maybe some haloing, that sort of thing; but I should be able to see patients the following day.

. . .

Q. . . . before ALK, of course, your vision was terrible; right?

A. Right.

Q. But you could, without your contact lenses, read in bed?

A. Yes.

Q. With both eyes?

A. Yes.

Q. After the ALK you could no longer do that?

A. No. No, I could not.

Q. After the flip flop,[2] you still could no longer read?

A. Still could no longer.

Q. But now you have double vision?

A. I had double vision after the ALK.

Q. So you had that also after the ALK?

A. Yes. That's what I'm trying to tell you. The positions changed . . .

Dr. Legg further testified:

A. So after the ALK, you had no usable vision in your left eye. Is that a fair statement?

A. If I would shut my right eye, you wouldn't want me looking at your teeth. I will tell you that.

Q. Well but I want to be more precise.

A. Yes. Terrible, terrible vision.

. . .

Q. So then you have two weeks after the ALK the flip flop procedure . . .

A. Right.

Q. . . . Which was intended to enhance your vision to where you had expected it would be after the ALK?

A. Right.

Q. And what you're saying is it did not improve the vision at all?

A. No useful improvement.

. . .

Q. So there was an immediate deterioration of your vision after the surgery?

A. Yes.

Q. And it didn't improve after the enhancement?

A. It's as bad today as it was then.

The treatment that Dr. Legg received from Dr. Rashid in January of 1997 was such a failure that Dr. Legg should have recognized that his condition was directly related to Dr. Rashid's alleged malpractice on the day after his surgery. We stated in *Gaither, supra,* that "we do not go so far as to require recognition by the plaintiff of negligent conduct." 199 W.Va. at 714, 487 S.E.2d at 909. Instead, we explained that "once a patient is aware, or should reasonably have become aware, that medical treatment by a particular party has caused a personal injury, that stat-

---

**2.** This question is in reference to the second procedure performed on Dr. Legg's left eye by Dr. Rashid in an attempt to correct his vision.

This surgery occurred approximately two weeks after the January 13, 1997, initial procedure.

ute begins." *Id.* We further recognized that "in some circumstances causal relationships are so well established that we cannot excuse a plaintiff who pleads ignorance." *Id.* at 712, 487 S.E.2d at 907. Also, in *Gaither,* we explained that "the statute of limitations will begin to run once the extraordinary result is known to the plaintiff even though he may not be aware of the precise act of malpractice." (Citation omitted).

■ In *Gaither,* this Court noted that "[i]n the great majority of cases, the issue of whether a claim is barred by the statute of limitations is a question of fact for the jury." 199 W.Va. at 714, 715, 487 S.E.2d at 909, 910. While many cases will require a jury to resolve the issue of when a plaintiff discovered his or her injury, including the related issue of whether the plaintiff was reasonably diligent in discovery of his or her injury, the issue can also be resolved by the court where the relevant facts are undisputed and only one conclusion may be drawn from those facts. *See Harrison v. Davis,* 197 W.Va. 651, 660, 478 S.E.2d 104, 113 (1996) (upholding trial court's decision that plaintiff failed to exercise reasonable diligence in discovering injuries); *Cathedral of Joy Baptist Church v. Village of Hazel Crest,* 22 F.3d 713, 719 (7th Cir.1994); *Witherell v. Weimer,* 85 Ill.2d 146, 52 Ill.Dec. 6, 421 N.E.2d 869, 874 (1981).

■ Because Dr. Legg admits that he was immediately aware of his eye injury and resulting loss of vision, the question of whether he acted with reason, under the facts of this case, was properly a legal question for the trial court to resolve. In fact, Dr. Legg stated that he immediately recognized that the procedure "had in fact greatly diminished his vision." Thus, given the specific facts of this case, we believe that the two-year statute of limitations began to run

on that date and it expired on January 14, 1999, more than six years prior to Dr. Legg's June 9, 2005, filing of a medical malpractice lawsuit against Dr. Rashid.[3]

Moreover, even if we were to give Dr. Legg the benefit of the doubt with regard to whether or not he should have known about the alleged malpractice by January 14, 1997, the record still reveals that according to his own deposition testimony, Dr. Legg knew, or reasonably should have known, of Dr. Rashid's alleged negligence at a minimum by the spring of 2001, which was still well beyond the two-year statute of limitations period given his June 9, 2005, filing of the medical malpractice action against Dr. Rashid.

Dr. Legg explains that he was last treated by Dr. Rashid during the fall of 2000, whereby he set up an appointment during the spring of 2001 with Dr. Michael Harris. Dr. Legg's testimony regarding his visit with Dr. Harris is as follows:

Q. Did Dr. Harris ever fit you with ...

A. Dr. Harris was never able to fit my left eye. The right eye was perfect. He did great on it, but the left eye he could never get the lens to seat.

Q. Did he ever explain to you why that was?

A. Yes. The cornea was so irregular it wouldn't seat.

Q. What would cause that?

A. The surgery, the ALK surgery [by Dr. Rashid] and the flip flop surgery. Corneal surgery, I should say.

Q. He actually told you that? A. Well, yes, he did.

Finally, assuming, *arguendo,* that Dr. Legg's discussion with Dr. Harris was not sufficient evidence to show that he knew, or reasonably should have known, of Dr. Rash-

---

3. Dr. Legg makes reference in this appeal that Dr. Rashid may have committed fraud in an effort to keep him from filing a legal action against him. Dr. Legg, however, did not raise this issue below. The circuit court specifically found that "[t]here is no allegation of fraudulent concealment by the defendant and the Court finds no evidence thereof." This Court made clear in *Powderidge Unit Owners Association v. Highland Properties, Ltd.,* 196 W.Va. 692, 700, 474 S.E.2d 872, 880 (1996), the limitations of

our reviewing authority in summary judgment appeals:

Although our review of the record from a summary judgment proceeding is *de novo,* this Court for obvious reasons, will not consider evidence or arguments that were not presented to the circuit court for its consideration in ruling on the motion. To be clear, our review is limited to the record as it stood before the circuit court at the time of its ruling.

id's alleged negligence, then we are faced with Dr. Legg's consultation with Dr. Lee Wiley in December 2002. Dr. Legg maintains that his visit with Dr. Wiley, wherein he claims that he learned that the pre-operative procedure of Dr. Rashid was supposedly the source of his unsuccessful 1997 procedure, occurred in July 2003. However, as the circuit court noted, "In December 2002, [Dr. Legg] consulted Dr. Lee Wiley in Morgantown, West Virginia who explained to [him] that before the cornea can be measured for surgical correction, the patient must stop wearing contact lenses for one to two months to allow the cornea to revert to its natural curvature." Likewise, Dr. Wiley testified as follows during his deposition:

Q. ....what was done for the patient [Dr. Legg] during the initial exam and initial visit of December '02?

A. I performed a topography measurement, which is a measurement of the corneal curvature, and determined that there was kind of an unusual irregular astigmatism in the left eye, and then postulated that that can be due to a variety of things including potentially a change in the curvature of the cornea induced by chronic contact lens wear.... [Dr. Legg] opted to come back after having stopped the lens for several weeks for me to redo some measurements.

Q. So the plan of December 10th [2002] was to do what for this patient?

A. Basically, refer him to [Dr.] Charleton, because his original question to me on our initial visit was could I perform a laser treatment to correct the vision in the left eye. That was a question he had for me.
Usually we won't provide any information concerning laser vision correction until someone's been out of contacts for quite some time, because we know contact lenses can alter the curvature and the refractor status of the eye. So, typically we ask people to be out of the hard lenses for quite some time. Usually it's a month or two for hard contact lenses. Usually it's several weeks for soft contact lenses.

Clearly, Dr. Legg knew, or reasonably should have known, of Dr. Rashid's alleged negligence prior to July 2003, the date on which Dr. Legg claims the two-year statute commenced. We therefore find that based upon the information in the record, Dr. Legg's filing of a lawsuit against Dr. Rashid was barred by the statute of limitations. Accordingly, we find that summary judgment in favor of Dr. Rashid was appropriate.

## IV.

### CONCLUSION

For the reasons set forth above, the August 22, 2006, final order of the Circuit Court of Kanawha County is affirmed.

Affirmed.

Justice DAVIS and Justice BENJAMIN, deeming themselves disqualified, did not participate in the decision of this case.

Judge KING and Judge JOHNSON sitting by temporary assignment.